**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 24-CR-252-NYW

UNITED STATES OF AMERICA,

Plaintiff,

v.

RYAN L. ULIBARRI,

Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

The United States of America, by and through U.S. Department of Justice Tax Division Trial Attorneys Amanda R. Scott and Lauren K. Pope, hereby submits this Sentencing Statement. The Government concurs with the Sentencing Guidelines range calculated by U.S. Probation ("Probation") in the Presentence Investigation Report ("PSR") (ECF No. 41), resulting in a Total Offense Level of 20 and a Sentencing Guidelines range of 33 to 41 months' imprisonment. For the reasons explained below, the Government respectfully requests that the Court impose a sentence at the high-end of the Sentencing Guidelines range and, in so doing, deny Defendant Ryan L. Ulibarri's Motion for Variance (ECF No. 48). Specifically, the Government requests that the Court impose a sentence of 41 months' imprisonment, three years of supervised release, a fine of $150,000, and restitution of $2,013,395.

## INTRODUCTION

For over seven years, Defendant Ryan L. Ulibarri ("Defendant") cheated the United States Treasury and evaded paying taxes on approximately $5.3 million in income he earned from his successful dental practice, Ulibarri Family Dentistry. He did so by using a fraudulent tax shelter

involving a multi-tiered, layered trust structure (hereinafter, the "Abusive-Trust Tax Shelter"). Tax shelters nearly identical to the Abusive-Trust Tax Shelter have long been recognized as unlawful tax evasion schemes designed to divert an individual's income through a series of sham trusts utterly devoid of economic substance. *See, e.g.*, *United States v. Vallone*, 698 F.3d 416, (7th Cir. 2012); *United States v. Aldridge*, 561 F.3d 759 (8th Cir. 2009).

Here, Defendant's tax shelter included a so-called "business trust" called Smile High Trust; a "family trust" called Title of Liberty Family Trust; a "charitable trust" called Rod of Iron Charitable Trust; and a so-called "private family foundation," which was also set up as a trust, called Faith Hope & Trust Foundation. These trusts were designed to look like non-grantor trusts, which have separate parties as the grantor, beneficiary, and trustee and are taxed as a separate legal entity. In reality, however, these trusts were sham entities—nothing more than an extension of Defendant himself, designed to conceal income that he earned, controlled, and used from the Internal Revenue Service ("IRS"). From 2016 through 2023, Defendant evaded over $1.6 million in federal and state income taxes owed by assigning approximately 90% of his business income to his sham trusts to create the illusion that he did not earn that income, and by disguising those diverted funds as fictitious distributions, charitable donations, and "management fees." Defendant then filed over 60 false tax returns with the IRS and Colorado Department of Revenue ("Colorado DOR") relating to tax years 2016 through 2022.

Defendant knew his use of the Abusive-Trust Tax Shelter was fraudulent and illegal. From the outset, Defendant was warned, time and time again, by attorneys, accountants, and various third-party lenders that his use of the Abusive-Trust Tax Shelter appeared unlawful. Rather than heed these unequivocal warnings, Defendant chose to engage in a years' long pattern of deceiving tax authorities and banks to fund his lifestyle. He did not participate in this tax evasion scheme out

of need, but rather out of greed, arrogance, and the belief that he would get away with it.

For these reasons, and as explained more thoroughly below, the Government requests a sentence at the high-end of the Sentencing Guidelines range. The scope and duration of Defendant's criminal conduct warrants a sentence of 41 months' imprisonment, a three-year term of supervised release, a fine of $150,000, and an order for restitution in the amount of $2,013,395 payable to the IRS and Colorado DOR as a condition of supervised release. This sentence is sufficient and no greater than necessary to accomplish the goals of sentencing, and it fairly balances Defendant's history and characteristics, and the nature, circumstances, and seriousness of the offense, among other things.

## STATUTORY PENALTIES

Counts 1–6: The maximum sentence for a violation of 26 U.S.C. § 7201 is not more than five years' imprisonment, a maximum fine of $250,000, or both; a period of supervision of not more than three years; a $100 mandatory victims' fund assessment fee; costs of prosecution; and restitution in an amount to be determined at the time of sentencing.

## PROCEDURAL HISTORY

Defendant was charged by indictment with six counts of tax evasion, in violation of 26 U.S.C. § 7201, in August 2024. (ECF No. 1.) In February 2025, approximately two weeks before trial was set to begin, Defendant filed a notice of disposition setting forth his intent to plead guilty to the indictment without a plea agreement. (ECF No. 29.) He entered his guilty plea to each charged count on February 28, 2025 (ECF No. 36), and, as a factual basis, Defendant admitted that every paragraph in the indictment is true. (ECF No. 37.)

On May 13, 2025, Probation filed its PSR and sentencing recommendation. (ECF No. 41.) The PSR calculated a Total Offense Level of 20 and Sentencing Guidelines range of 33 to 41

months' imprisonment. (PSR ¶¶ 125 & 156.) In the PSR, Probation recommended the following sentence: (1) a high-end Guidelines term of imprisonment of 41 months per count to run concurrently; (2) a three-year period of supervised release; (3) a high-end fine of $150,000; (4) $1,611,587 in restitution to the IRS and Colorado DOR; and (5) a $600 mandatory special assessment, that is, $100 per count. (PSR, Ex. A at 1.)

On May 27, 2025, Defendant filed various objections to the PSR which collectively would reduce the offense level to 16. (ECF No. 44.) The Government filed its response to those objections on June 3, 2025, asking the Court to overrule each. (ECF No. 49.) Additionally, on June 3, 2025, Defendant filed a motion seeking an unspecified, below-Guidelines sentence based on the arguments set forth in his Sentencing Statement. (ECF Nos. 47 & 48.)

## FACTS RELEVANT TO SENTENCING

The Government agrees with the description of offense conduct set forth in the PSR at Paragraphs 5 to 102, and, for purposes of this Sentencing Statement, hereby adopts that description. The Government further provides the following factual summary, including additional information not described in other filings, to contextualize the exhibits attached to this Statement, as well as witness testimony that the Government intends to elicit during the sentencing hearing.[1]

### I. Defendant Purchased and Set Up the Abusive-Trust Tax Shelter Once His Dental Practice Became Successful

Following his 2010 graduation from West Virginia University School of Dentistry (PSR ¶ 144), Defendant quickly advanced his professional career as fully credentialed dentist. After spending roughly four years as an employee earning a six-figure salary, Defendant decided to start

[1] The Government anticipates calling IRS Revenue Agent Lizeth Maldonado as a witness during the sentencing hearing to introduce testimony regarding her computation of the tax loss and exhibits summarizing Defendant's banking activity for the years at issue. The Government will file witness and exhibits lists no later than two business days prior to the hearing, in accordance with NYW Crim. Practice Standard §§ IV.E.2 & IV.F.3.

his own dental practice: Ulibarri Family Dentistry. (*Id.* ¶¶ 145–46.) He first incorporated the practice as a New Mexico-based professional corporation ("P.C.") called Ryan L Ulibarri DDS P.C. After moving to Fort Collins in 2014, he converted the practice into a Colorado P.C.

Many witnesses described Defendant as an excellent dentist, and his business quickly took off. For tax years 2014 through 2016, Defendant filed tax returns for Ulibarri Family Dentistry as an S corporation, which is a type of entity recognized by the IRS that does not pay taxes but instead "passes" its income to its owner(s). By 2016, Defendant was paying himself a salary of approximately $100,000, while also earning hundreds of thousands of dollars in business profits, all of which he reported on his tax returns for these years. Following this success, however, Defendant's tax bill began to grow.

As his annual income grew, Defendant took steps to conceal future profits from the IRS and reduce his taxes to virtually nothing. In August 2016, he bought the Abusive-Trust Tax Shelter from an individual named Larry Conner for $50,000.[2] The trusts used in this tax shelter were sham trusts, which Defendant used to move money around so that on paper he fictitiously appeared to own a mere 10% interest in Ulibarri Family Dentistry. In reality, Defendant directed, controlled, and benefitted from the millions of dollars he fraudulently assigned to his trusts. Despite receiving multiple warnings against using the shelter—which began within weeks of purchasing it—Defendant continued to divert income to the structure through at least mid-2024.

## II. Defendant Fraudulently Recruited Friends to Execute Sham Trust Documents

To carry out the shelter, Defendant engaged in a series of sham paper transactions, starting with the trust instruments. Trusts are formed via documents called trust instruments, and those

[2] Larry Conner is separately charged with tax crimes related to his promotion, sale, and use of the Abusive-Trust Tax Shelter in *United States v. Larry Conner et al.*, No. 1:23-CR-390-RMR (D. Colo.) and *United States v. Larry Conner*, No. 4:23-CR-259-SDJ (E.D. Tex.).

documents typically identify the parties to the trust (the grantor, trustee, and beneficiary), any property to be held in the trust, and other terms such as how the property should be managed for the benefit of the beneficiary. Here, for a $50,000 fee, Defendant received paperwork for his four trusts, including the private foundation. This paperwork was a glaring red flag from the outset that the Abusive-Trust Tax Shelter could not be used to lawfully mitigate taxes, as the trust instruments purporting to create Defendant's trusts were nonsensical and contradictory.

Notably, Defendant used three different versions of trust documents for Smile High Trust, Title of Liberty Family Trust, and Rod of Iron Charitable. One version purported to create a "Pure Trust Organization in Common Law," containing rhetoric commonly used by tax defiers. (PSR ¶ 84; *see, e.g.*, Ex. 1.) Defendant kept this version strictly private (hereinafter, the "Secret Trust Documents"). As he told his former bookkeeper while applying for a business loan in October 2020, he would rather "terminate" a loan application than provide the "actual trust documents to the bank." (Ex. 2; PSR ¶ 86.) The second version, referred to as "Banking Documents," was a shorter, sterilized version designed to be given to banks upon request. (PSR ¶ 84; *see, e.g.*, Ex. 3.) The third version, referred to as a "Certification of Trustee," was shorter yet. This one-page document simply attested to the existence of underlying trust instruments. (PSR ¶ 84; *see, e.g.*, Ex. 4.) Each version materially contradicted the others, including by identifying different grantors and beneficiaries, and Defendant executed each version at various times between August 2016 and October 2018. (PSR ¶ 86.)

The trust instruments also did not reflect reality. To conceal the fact that Defendant purchased, created, and funded Smile High Trust and Title of Liberty Family Trust, he recruited family friends to falsely sign documents as nominal grantors of those trusts. (*Id.* ¶ 85.) According to the Secret Trust Documents, those family friends contributed a desk and chair to form each trust

and freely chose Defendant to serve as trustee. (*Id.*; *see, e.g.*, Ex. 1 at 2, 13.) Yet, when shown copies of the Secret Trust Documents, Defendant's friends were shocked to see that they were the named grantors. (PSR ¶ 85.) Instead, they believed they had simply signed this paperwork as mere witnesses for a one-time-only event as a favor to friends. (*Id.*)

Further, the trust instruments for Rod of Iron Charitable Trust and Faith Hope & Trust Foundation purported to establish entities designed exclusively to engage in charitable activity. Yet, in reality, Defendant used Rod of Iron Charitable Trust simply as sieve; over the years, virtually all of this trust's banking activity consisted of deposits from Title of Liberty Family Trust and withdrawals to Faith Hope & Trust Foundation, with no evidence of a single payment to a recognized charity. From 2017 through 2022, Defendant did use some funds funneled to Faith Hope & Trust Foundation's bank account to make tithes to his church. Out of the approximately $3.6 million in true business profits Defendant earned during those years, such payments amounted to approximately $50,000. Even so, Defendant used most of the money that he funneled to the sham foundation, approximately $105,000, to fund circular transfers—sending money back to his business and other trusts' bank accounts—and to purchase cryptocurrency, make other investments, buy season tickets for the Colorado Rockies, and fund a family vacation. These expenses served only Defendant and his family; they were not made for any charitable purpose.

## III. Defendant Furtively Set Up Nominee Bank Accounts for His Sham Trusts

Immediately after notarizing the Secret Trust Documents in 2016, Defendant attempted to open bank accounts for each sham trust at Bank of Colorado, which was then his primary bank. But the bank met him with resistance, refusing to set up a private family foundation bank account given that "such accounts were frequently met with legal problems." (Ex. 5.) Defendant ignored this red flag. Instead, he winded down his banking relationship with Bank of Colorado and transitioned to Wells Fargo, which was not familiar with the legal structure of Defendant's dental

practice before he had purchased the Abusive-Trust Tax Shelter. (*See* PSR ¶ 51.)

Instead of trying to open multiple accounts simultaneously, as he had with Bank of Colorado, Defendant took additional steps to conceal the true nature of his sham trusts in dealing with Wells Fargo. He did so by first obtaining private mailbox addresses for his trusts. The mailboxes were located at the same The UPS Store branch in Fort Collins. Yet the mailboxes were opened on different days during a one-week period, and each was intentionally numbered non-sequentially. This created the illusion that each trust was a distinct entity, when, in fact, they were all mere alter-egos of Defendant.

Armed with the non-sequential trust addresses, Defendant then repeated a similar process to establish the bank accounts at Wells Fargo. Over a three-month period, Defendant returned to the same bank branch location on three different days to open accounts in the name of his trusts, foundation, and business. By February 2017, Defendant drained the funds that he previously held at Bank of Colorado in a business account for Ulibarri Family Dentistry and closed the account. (PSR ¶ 72(m)–(n).)

## IV. Defendant Restructured His Dental Practice Against Prior Attorney's Advice and in Contravention of State Law

To implement the Abusive-Trust Tax Shelter, Defendant also reorganized Ulibarri Family Dentistry from a P.C. to a limited liability company ("LLC") in order to receive purported trust distributions. (*See id.* ¶ 49.) Before doing so, he consulted with his prior attorney and certified public accountant ("CPA"), Charles Mastin, who had helped him set up Ulibarri Family Dentistry as a Colorado P.C. a couple years before Defendant purchased the Abusive-Trust Tax Shelter. Specifically, in 2014, Mr. Mastin assisted Defendant in registering the business with the Colorado Secretary of State, serving as its registered agent from 2014 to 2016, and filing Defendant's individual and corporate tax returns for tax year 2014. Mr. Mastin also provided Defendant with

advice and assistance in acquiring a local retiring dentist's practice to kickstart his business and financing the deal with a commercial loan.

Mr. Mastin was the first to unambiguously warn Defendant against carrying out the Abusive-Trust Tax Shelter. In October 2016, Defendant asked Mr. Mastin: "can a dental S corporation be converted over to an LLC and if so can a business trust be named as a participating member of the LLC if the trustee of the business trust is a licensed practitioner?" (Ex. 6; PSR ¶ 50.) Mr. Mastin replied: "What a wacky structure. Why would you want to do this?" (*Id.*) Mr. Mastin further warned that a trust cannot be a valid owner of a dental practice under Colorado law and that, in any event, liquidation of the S corporation would cause a taxable event. (*Id.*)

Nevertheless, Defendant ignored Mr. Mastin's guidance. In November 2016, Defendant filed paperwork with the Colorado Secretary of State converting Ulibarri Family Dentistry to an LLC effective 2017. And, nearly two years after being sternly warned against transferring his practice to a trust, Defendant filed his 2017 tax returns reporting that his self-proclaimed "business trust" (i.e., Smile High Trust) was the 90% owner of his dental practice in September 2018. He went on to repeat this criminal conduct for years, despite receiving additional unequivocal and increasingly emphatic warnings against doing so.

## V. Defendant Misused Legal Services to Defraud Banks and Further His Tax Evasion Scheme

Anda Stephenson is another attorney who provided legal services to Defendant during the relevant period, roughly November 2018 through August 2019. During this period, Defendant retained the law firm where Ms. Stephenson worked at the time to represent him during a dispute with Guaranty Bank & Trust Company ("Guaranty Bank") regarding the loan described below.

In November 2017, Defendant obtained a $750,000 commercial loan from Guaranty Bank to refinance the loan he obtained to acquire the dental practice that Mr. Mastin helped him purchase

in 2014. Defendant personally guaranteed this loan. During the application process, Defendant represented that he wholly owned Ulibarri Family Dentistry and signed various agreements providing that he would promptly notify the bank of any change in management or ownership of the dental practice. Through its own due diligence, and contrary to Defendant's representations, Guaranty Bank eventually learned that Smile High Trust purportedly owned 90% of Ulibarri Family Dentistry. Guaranty Bank then declared a loan default and obtained legal counsel, Richard Beller.

Mr. Beller notified Defendant that he was representing Guaranty Bank during the default process via a letter dated October 18, 2018. (Ex. 7.) The October 2018 letter demanded immediate repayment in full and explained alternate theories of how Defendant defaulted the loan. (*Id.*) On one hand, Mr. Beller noted that if Smile High Trust in fact owned 90% of Ulibarri Family Dentistry before Defendant obtained the loan, then Defendant lied on the loan application by representing that he wholly owned Ulibarri Family Dentistry. (*Id.*) On the other hand, if the ownership change occurred after Defendant obtained the loan, then he breached his contractual obligation to notify Guaranty Bank of any changes in Ulibarri Family Dentistry's ownership. (*Id.*) The letter also claimed that Defendant refused Guaranty Bank's requests for documentation concerning Smile High Trust. (*Id.*)

In an attempt to mend the relationship, Defendant provided copies of his trust agreements to Guaranty Bank. The bank saw right through these documents and said as much to Defendant. In a second letter dated November 14, 2018, Mr. Beller stated: "We have reviewed the trust instruments you have provided, and unfortunately, they are not satisfactory to the Bank." (Ex. 8.) Mr. Beller further expressed "serious concerns about the legitimacy of these 'pure trusts' under federal income tax law." (*Id.*) The letter informed Defendant that he could cure the default by

doing two things: (1) assuming 100% ownership of the DDS "so that no trust owns any portion of the Dental Office" and (2) "obtain[ing] an opinion letter from a local tax attorney acceptable to Guaranty that the Dental Office and [Defendant] are in full compliance with [Defendant's] obligations under federal income tax law, notwithstanding [his] 'pure trust' arrangements." (*Id.*)

At Defendant's request, Ms. Stephenson set to accomplishing each requirement. Almost immediately, she unambiguously informed Defendant, yet again, that he was violating state law by having a trust own Ulibarri Family Dentistry and advised that he terminate the trust. (Ex. 9.) Ms. Stephenson then prepared an amended operating agreement and membership interest transfer agreement for Ulibarri Family Dentistry effective January 2019. (Ex. 10.) According to these agreements, Defendant's wife and Smile High Trust—who, on paper, then collectively owned 95% Ulibarri Family Dentistry—transferred their ownership interests to Defendant. Thus, Defendant became 100% owner on paper, satisfying Guaranty Bank's first condition to cure the default—or so Guaranty Bank and Ms. Stephenson believed. After executing these agreements, Defendant continued to file tax returns for years 2018 through 2022 reporting Smile High Trust as his dental practice's 90% owner. In fact, he never had any intention of honoring the amended ownership agreements prepared by Ms. Stephenson. In his words, Defendant signed the paperwork simply "to appease Guaranty Bank." (Ex. 11.)

Defendant did not reveal this deceit to Ms. Stephenson, who next directed her attention to Guaranty Bank's second condition. That is, she attempted to secure a letter from a local CPA opining that Ulibarri was complying with his tax obligations, despite his use of the trusts. Ms. Stephenson was unsuccessful; no CPA would write such letter unless Defendant would "consider[] changing the structure." (Ex. 12.) Ms. Stephenson strongly advised Defendant that he should do as the CPAs recommended. But Defendant was not interested in losing the financial benefits of

the Abusive-Trust Tax Shelter.

The warnings Defendant received urging him to abandon the Abusive-Trust Tax Shelter only became more pointed. In July 2019, Ms. Stephenson sent Defendant another letter from Guaranty Bank, in which Mr. Beller wrote: "it appears that [Defendant's] 'pure trust' arrangements constitute an illegal tax shelter that has long been recognized as illegal." (Ex. 13; PSR ¶ 87.) The letter allowed Defendant two weeks' final notice to "demonstrate [his] full compliance with [his] federal and state tax obligations" or else pay the entire remaining principal in full plus attorneys' fees. (Ex. 13.) Ulibarri chose the latter, apparently concluding that the money he would save evading taxes would outweigh the costs of attorneys' fees.

## VI. Defendant's Troubling History with Third-Party Lenders

One downside Defendant experienced using the Abusive-Trust Tax Shelter was that he had a hard time obtaining financing from third-party lenders. Simply put, Defendant had concealed so much income from the IRS that, on paper, he did not appear creditworthy. Still, over the years, Defendant sought additional funds to expand his business and purchase real estate, new vehicles, and luxury boats. As a result, he had frequent dealings with banks and other private lenders to achieve these material desires.

During these dealings, Defendant engaged in a troubling pattern. He repeatedly withheld information from lenders regarding his sham trusts and tax compliance; selectively claimed the income he diverted to his trusts as his own income, despite omitting such income from his tax returns; provided inconsistent information to different lenders; and altered records, which he gave to banks in support of loan applications. (*See* PSR ¶¶ 83, 89.) Between November 2017 and March 2023, Defendant submitted no fewer than 15 financing applications, providing false, inconsistent, or misleading information to prevent lenders from determining the scope and nature of his tax shelter. (*Id.* ¶ 89.) For a fulsome account of this history, see the Government's Notice of Rule

404(b) Evidence (ECF No. 24), which is incorporated here by reference.

Some prospective lenders learned through independent due diligence that Defendant was withholding information about his business structure. These instances resulted in yet more warnings that Defendant's use of the Abusive-Trust Tax Shelter was highly problematic. For example, in March 2020, a private lender called ReadyCap LLC ("ReadyCap") requested additional information regarding Defendant's trusts after learning on a call that there "were a couple of trusts we didn't know about" to ensure "the structures of these trusts don't present any potential problems with the IRS in the future." (Ex. 14.) Two months later, a broker helping Defendant in his dealings with ReadyCap informed him that ReadyCap's lawyers "can't get comfortable with how your CPA is taking the expenses for your Trust accounts," explaining that his deposit would be returned. (Ex. 15.)

Additionally, in 2021, Defendant provided a flagrantly altered and backdated operating agreement for Ulibarri Family Dentistry to Huntington Bank to obtain financing when purchasing commercial real estate for his dental practice. (*See* PSR ¶ 74(h).) Defendant first executed that operating agreement in 2018, but the document was backdated to November 2016. (*See id.*) Then, in January 2021, Defendant altered key information regarding the ownership of Ulibarri Family Dentistry, so that the organizational document would match his false tax returns, before producing the agreement to Huntington Bank. In so doing, he kept the original notary stamp from 2018. (*Id.*) Defendant's willingness to provide altered documents to banks highlights the flagrant nature of his criminal conduct. Not only was Defendant willing to lie to the IRS year after year, but he was also willing to lie to banks to carry out his tax evasion scheme.

## VII. Defendant's False Returns (2016–2022) and Failure to File (2023)

One of Defendant's principal affirmative acts of evasion for each count of conviction was his filing of false federal income tax returns for each year. By pleading guilty to the indictment,

Defendant admits that he filed the following false forms and returns with the IRS:

- A false Form 1023-EZ, Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code for Faith Hope & Trust Foundation that falsely attested that he would derive no personal benefit from the foundation.
- Six false Forms 1040, U.S. Individual Income Tax Returns ("Form 1040") that materially underreported his total income and taxes, for each year from 2017 to 2022.
- Six false Forms 1065, U.S. Return of Partnership Income for Ulibarri Family Dentistry that fraudulently assigned 90% of the practice's net profits to Smile High Trust, for each year from 2017 to 2022.
- Eighteen false Forms 1041, U.S. Income Tax Return for Estates and Trusts for Smile High Trust, Title of Liberty Family Trust, and Rod of Iron Charitable Trust, for each year from 2017 to 2022, which: (1) fraudulently reported as income funds that Defendant earned, controlled, and benefitted from individually; (2) claimed false deductions for the payment of Defendant's personal expenses disguised as expenses of his sham trusts; and/or (3) claimed false charitable contribution deductions for funds he purportedly "donated" to Faith Hope & Trust Foundation without losing control over or benefit from these "donated" funds.
- Six false Forms 990-PF, Return of Private Foundation ("Form 990-PF") for Faith Hope & Trust Foundation, for each year from 2017 to 2022, which: (1) fraudulently reported as tax-exempt charitable contributions funds that Defendant earned, controlled, and benefitted from individually; and (2) falsely reported certain personal expenses as charitable expenses.

Additionally, Defendant filed a Form 1040 for tax year 2016 that falsely reported a fictitious $50,000 "donation" that he paid to his foundation. He also filed a false Form 990-PF for Faith Hope & Trust Foundation for the same year reporting the "contribution." This "donation," however, was nothing more than a bank transfer; Defendant simply moved that $50,000 from one pocket to the other. Defendant also filed false state income tax returns with the Colorado DOR relating to tax years 2016 through 2022 that mirrored his fraudulent federal filings. In total, Defendant filed 67 false federal and state tax returns for these years.

In filing these false returns, Defendant was driven by his own financial greed. Before setting up the Abusive-Trust Tax Shelter, he was paying tens of thousands of dollars in federal income taxes on income he earned through Ulibarri Family Dentistry annually. Yet despite making

no changes to his daily business operations,[3] *see* PSR ¶ 52, the first year Defendant filed tax returns using the tax shelter, his reported total tax due plummeted from $95,105 in 2016 to $159 in 2017. This trend is depicted below.




In addition to the false returns described above, Defendant also did not timely file federal income tax returns or pay taxes for tax year 2023. Instead of paying his fair share of taxes for tax years 2016 through 2023, Defendant funded his lifestyle. (*See* PSR ¶ 94.) During those years, Defendant spent, or otherwise withdrew, nearly $6 million from bank accounts he opened in the name of his sham trusts.

[3] When asked if any notable changes in business operations occurred around 2016 or 2017, one former employee of Ulibarri Family Dentistry remarked that the only thing that came to her mind was that Defendant "got really greedy" around then.

## SENTENCING GUIDELINE COMPUTATIONS

Determining an appropriate sentence begins with calculating the Sentencing Guidelines range, which serves as "the starting point and the initial benchmark" for the Court to consider. *United States v. Maynard*, 984 F.3d 948, 956 (10th Cir. 2020). The Government agrees with the calculations in the PSR, resulting in a Final Offense Level of 20. The following sections explain why those calculations are correct.

### I. Tax Loss

Under the Guidelines, the Court must aggregate the tax loss from the counts of conviction and all relevant conduct. *See* U.S.S.G. §§ 3D1.2, 1B1.3. The Guidelines also direct that "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1, Application Note 2. Here, the loss for the six tax evasion counts is $1,266,068. This figure reflects the amount of federal income tax that Defendant evaded for tax years 2017 to 2022. The total tax loss also properly includes the following three categories of relevant conduct.

*First*, Defendant falsely reported a $50,000 charitable donation to his private foundation, Faith Hope & Trust Foundation, on his 2016 Form 1040. Doing so fraudulently reduced his taxable income and resulted in a $16,500 tax loss. Because Defendant was warned against using the tax shelter before filing this false tax return, the Court should include this loss as relevant conduct. *See United States v. Meek*, 998 F.2d 776, 781 (10th Cir. 1993) (court properly included tax loss from uncharged tax evasion in prior years); *United States v. Neighbors*, 23 F.3d 306, 311 (10th Cir. 1994) (court properly included tax loss from years barred by statute of limitations).

*Second*, the tax loss should include unpaid state income taxes related to tax years 2016 to 2022, which is $166,966. During these years, Defendant filed false individual, business, and trust income tax returns with the state of Colorado, which were based on the amounts Defendant

fraudulently reported on his federal income tax returns. Accordingly, these false returns are clearly based on the same course of conduct as the charged offenses. *See e.g.*, *United States v. Yip*, 592 F.3d 1035, 1039–40 (9th Cir. 2010); *United States v. McElroy*, 587 F.3d 73, 88–89 (1st Cir. 2009); *United States v. Maken*, 510 F.3d 654, 657–59 (6th Cir. 2007).

*Third*, the tax loss should include unpaid federal income taxes related to tax year 2023, which is $162,053. To date, Defendant has not filed any tax returns for himself individually or his dental practice for tax year 2023 despite earning substantial income. According to IRS records, Defendant's dental practice grossed over $1.6 million via credit card payments and insurance pay-outs during 2023. Of this amount, IRS reviewed bank records and verified that Defendant's dental practice grossed at least $976,223, on which Defendant must pay taxes but has not.[4]

This loss should be included as relevant conduct because bank records indicate that Defendant intended to evade federal income taxes using the fraudulent tax shelter for 2023 as well. Defendant transferred nearly $650,000 from a bank account in his dental practice's name to a bank account in the name of his business trust, Smile High Trust, during 2023. Of that amount, approximately $540,000 was then transferred to a bank account in the name of his family trust, Title of Liberty Family Trust. This transfer activity mirrors the pattern seen in bank records for 2017 to 2022. Because Defendant "use[d] a consistent method to evade or camouflage income" during 2023—e.g., diverting business income to trust bank accounts—the Court should include the federal income tax loss for 2023 in the calculation of the base offense level. U.S.S.G. § 2T1.1, Application Note 2(B).

Altogether, the total tax loss is $1,611,587, resulting in a base offense level of 22. *See id.* § 2T4.1(I).

---

[4] This figure is a conservative estimate. Because the IRS did not consider any cash deposits in conducting this analysis, Defendant's unreported and unpaid tax due for 2023 is likely higher.

## II. Sophisticated Means

Defendant qualifies for a two-level enhancement for the use of sophisticated means. § 2T1.1(b)(2). The Guidelines specifically provide that offense conduct "such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." U.S.S.G. § 2T1.1, Application Note 5.

Clearly, Defendant's use of four sham trusts, including one set up as a fraudulent charity, to conceal his income from the IRS constitutes sophisticated means. *See, e.g.*, *United States v. Vernon*, 814 F.3d 1091, 1107 (10th Cir. 2016) (finding no error in imposing sophisticated means enhancement to defendant's sentence for five counts of tax evasion based on creation of a sham corporation); *United States v. Schwartz*, 408 F. App'x 868, 870 (6th Cir. 2010) (upholding the imposition of a sophisticated means enhancement where the defendant created and used fictitious trusts to hide assets from the IRS, even though the defendant was not a sophisticated businessman); *United States v. Hamelink*, 483 F. App'x 789, 791 (4th Cir. 2012) (per curiam) (affirming sentence, including imposition of a sophisticated means enhancement, where the defendant concealed income from the IRS through "use of bogus trusts" and "nominee entities").

## III. Acceptance of Responsibility

Section 3E1.1(a) provides that if "the defendant clearly demonstrates acceptance of responsibility for his offense," a two-level reduction is appropriate. Defendant admitted that each paragraph of the indictment was true and accurate, and the Court entered his plea of guilty to each count of the indictment. Defendant has thus demonstrated acceptance of responsibility within the meaning of § 3E1.1(a).

The Government will not, however, move for an additional one-point reduction under § 3E1.1(b), as Defendant did not timely notify authorities of his intention to enter a plea of guilty. Defendant filed a notice of disposition indicating his intent to plead guilty to the indictment only

approximately two weeks prior to trial. The Government had already taken many substantive steps in "preparing for trial," including "preparing witnesses for trial, in limine motions, proposed voir dire questions and jury instructions, and witness and exhibit lists." § 3E1.1(b).

## IV. Criminal History

The Government is not aware of any relevant criminal history for Defendant.[5]

## V. Certain Zero-Point Offender

Defendant appears to qualify for an additional two-level reduction as a certain zero-point offender under § 4C1.1.

## VI. Final Offense Level and Sentencing Range

Based on the above information, the final offense level is 20, as summarized below. With a Criminal History Category of I, Defendant faces a term of imprisonment of 33 to 41 months.

**Guidelines Summary: Counts 1–6**

| | |
|---|---|
| Tax Loss > $1,500,000 – §§ 2T1.1(a)(1), 2T4.1(I) | 22 |
| Offense involved sophisticated means (layered trusts) – § 2T1.1(b)(2) | +2 |
| Acceptance of Responsibility – § 3E1.1(a) | -2 |
| Zero-Point Offender – § 4C1.1 | -2 |
| Total offense level | 20 |

## SECTION 3553(a) ANALYSIS

The Government respectfully submits that a high-end Guidelines sentence of 41 months' imprisonment is necessary to reflect the seriousness of Defendant's offense conduct, provide just punishment, afford deterrence, and promote respect for the law. Defendant's request for an unspecified, downward variance should thus be denied, as it is not supported by the factors enumerated in 18 U.S.C. § 3553(a).

[5] In 2021, Defendant was charged in Larimer County with offenses for Failure to Appear and Operating an Unequipped Boating Vehicle. Those charges were dismissed in August 2022.

## I. Nature & Circumstances of the Offense

Tax fraud is a serious crime and violates the most basic covenant between citizens and the government. *See United States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) ("[t]ax crimes represent an especially damaging category of criminal offense" which "strike[] at the foundation of a functioning government'"); *United States v. Carlson*, 498 F.3d 761, 764 (8th Cir. 2007) ("[t]ax offenses, in and of themselves, are serious offenses") (cleaned up). Put simply, tax fraud constitutes theft from the pockets of every taxpaying citizen of this nation. The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns, evade income taxes, or fail to file tax returns. As Justice Oliver Wendell Holmes famously observed, "[t]axes are what we pay for a civilized society . . . ." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).

Defendant's criminal activity in this case was consistent and flagrant. The amounts involved—over $5 million in concealed income, with a corresponding tax loss exceeding $1.6 million—alone warrant a sentence within the Guidelines range. Defendant caused that tax loss by making the conscious decision, year after year, to flout his tax obligations. He did so by diverting and funneling business profits through a series of sham trusts, including a fake charity, filing false tax returns, and misleading banks and tax professionals.

Defendant chose this criminal path notwithstanding the fact that he had been warned, time and time again, by outside legal and accounting professionals that the shelter was illegal. Indeed, he was first warned against using the Abusive-Trust Tax Shelter by the attorney/CPA he had

entrusted to initially set up Ulibarri Family Dentistry, Mr. Mastin, roughly two years before he filed a single false return. Further, every time a lender questioned the trusts or his tax compliance, Defendant had yet another opportunity to come clean, file corrected returns, cease operating his dental practice in violation of state law, and obtain funding from third party lenders based on honest representations about his true income. But Defendant consciously decided to carry out his tax fraud scheme, refusing to part with the unreported and untaxed income that he used to fund his lavish lifestyle.

Defendant's calculated efforts were intentionally designed to mislead tax authorities, and in so doing, he caused over $1.6 million in unpaid federal and state income taxes between 2016 to 2023. Defendant would very likely have continued filing false tax returns consistent with the Abusive-Trust Tax Scheme if not for the efforts of IRS-Criminal Investigation ("IRS-CI"). This is perhaps best shown by the fact that Defendant *continued* to funnel untaxed business profits to bank accounts in the name of his sham trusts after receiving a target letter from the Department of Justice in September 2023 and a reverse proffer presentation by the Department of Justice Tax Division in February 2024. Moreover, Defendant's conduct is particularly troubling here as he demonstrated not only a fundamental disregard for the IRS and for the U.S. taxation system, but also U.S. banking institutions. In sum, Defendant's prolonged and serious criminal conduct warrants a term of incarceration of 41 months.

**II. History & Characteristics of Defendant**

Unlike many defendants who appear before this Court, Defendant grew up in a stable and secure home with a large and loving family and friend network, with no history of drugs or abuse. (*See* PSR ¶¶ 133–36.) He obtained a doctorate in dental surgery ("DDS") degree at West Virginia University School of Dentistry. (*Id.* at ¶ 144.) After, he worked as a dentist earning six figures before starting his own successful dental practice just four years after earning his DDS. (*See id.* at

¶¶ 145–46.) Despite this solid personal and professional background, which provided him all the material comforts needed, Defendant deliberately chose to conduct his business and personal tax affairs through fraud, cheating federal and state tax authorities of over $1.6 million spanning the course of seven-plus years.

Defendant plainly knew right from wrong. He knew that he was obligated to report all his business income to the IRS, and he knew that he was required to pay his share of taxes. And yet, unlike millions of hard-working taxpayers who timely file and pay their taxes each year, Defendant chose to evade his obligations through a multi-year tax evasion scheme that he carried out using no fewer than four sham trusts until he received a letter informing him that he was a target of a criminal investigation. But even then, he continued to funnel business profits through various bank accounts that he opened in the name of his trusts through 2024. And even now, as he stands to be sentenced, Defendant failed to complete the financial packet, as directed by Probation in preparing the PSR. Notably, in so doing, he omitted two of his most valuable assets: whole life insurance policies to which he contributed over $1.2 million in untaxed income between March 2017 to August 2022. (*See* PSR ¶¶ 149–50.) Defendant's tax fraud was plainly a crime of opportunity driven by greed, not necessity.

Defendant's purported intention to make a "substantial payment" to the IRS before sentencing does little to nothing to mitigate his crimes. (*See* ECF No. 44 at 4.) "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). As one court astutely observed, tax cheats deserve no "good citizenship reward" for belatedly paying that which is owed. *See United States v. Zukerman*, No. 16-CR-194 (AT) (S.D.N.Y.), Sent. Tr. at 18–19 (ECF No. 60)

(deriding suggestion by defense counsel that defendant deserved special credit for belatedly paying taxes: Court: "So do you think [the defendant] should get a good citizenship reward for paying the back taxes?"). In fact, if courts were to reward tax defendants for paying restitution ahead of sentencing with little to no jail time, it would send a message to future tax criminals that they can take the risk and pay their way out of jail time if caught.

Defendant could have made a payment to the IRS or amended his false tax returns at any point. Indeed, as mentioned earlier, Defendant had been introduced to reputable, local CPAs who were willing to help him unwind his Abusive-Trust Tax Shelter to cure the Guaranty Bank loan default as early as 2018. Instead, he made the calculated and greed-driven decision to continue concealing his income through the tax shelter. His intention to only now make such a payment—long after receiving a target letter and a reverse proffer presentation, being indicted, and pleading guilty—makes clear that Defendant did not suffer a crisis of conscience. Instead, he had been caught.

Similarly, any loss of Defendant's professional license, standing, or business, and the felony convictions associated with his name are not factors this Court should consider. (*See* ECF No. 47 at 5.) "None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (quotations omitted); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-

> middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

Defendant seeks a variant sentence in large part based on his personal characteristics, including that he is family-oriented and engaged in his church. (*See* ECF No. 47 at 2; ECF No. 48 at 6; *see also* PSR ¶¶ 137–39.) The Government does not question this. But these positive qualities, while admirable, do not set him apart from other similarly-situated white-collar defendants—individuals who, although generous and successful, nonetheless choose to lie and defraud, hiding that side of themselves from their family, friends, and colleagues. However commendable Defendant's family ties and community involvement may be, these acts are unexceptionable and insufficient to warrant a below-Guidelines sentence. *See* U.S.S.G. §§ 5H1.11, 5H1.6; *United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").

Finally, Defendant's criminal conduct was far more than a brief lapse in judgment. For years, Defendant participated in a multi-faceted tax fraud designed to cheat the IRS and, in so doing, concealed over $5 million in income. That cheating involved multiple false statements made under oath, on both tax returns and other documents.

## III. The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). General deterrence is vitally important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. According to the IRS, "the

underreporting of business income by individual taxpayers—income of sole proprietors, farmers and those earning rental, royalty, partnership, and S Corporation income—is a major contributor" to the "Gross Tax Gap (the amount of 'true' tax that is not paid voluntarily or timely)," which the IRS estimates at approximately $441 billion annually. Chuck Rettig, *A Closer Look: Impacting the Tax Gap*, IRS, 1–3, *available at* https://www.irs.gov/pub/foia/ig/cl/tax-gap-for-web.pdf (last visited June 3, 2025). That is because such income is generally not visible to the IRS absent voluntary reporting. This means that hundreds of billions of dollars are lost every year because people like Defendant—who otherwise fully enjoy the myriad public benefits that the tax system supports, like roads and schools—choose to shirk their responsibilities as taxpayers.

Simply put, meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 EMORY L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect."). As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

Accordingly, the need for general deterrence is at its peak in tax fraud cases, which are

lucrative, easy to perpetrate, and difficult to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it"). Thus, in order to provide adequate general deterrence, sentences in criminal tax cases must be substantial. *See United States v. Peppel*, 707 F.3d 627, 638 (6th Cir. 2013).

A below-Guidelines sentence here would fail to serve the goal of general deterrence. The message that would be sent to the community by such a lenient sentence is that tax fraud is not a serious crime and that a multi-long, lucrative tax fraud is, in essence, not worthy of serious punishment at all. Such a sentence would provide a would-be tax cheat every incentive to perpetrate a tax evasion scheme—the reward is high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal. Respectfully, that is *not* the message that this Court should send to the public through its sentence in this case.

Moreover, the need for general deterrence is even greater in cases involving the widespread promotion and use of unlawful tax shelters, such as the Abusive-Trust Tax Shelter. The imposition of a serious custodial sentence will not go unnoticed to promoters of these schemes or the wealthy business owners who decide that the reward of participating in a plainly abusive tax shelter is worth the risk of committing tax evasion. *See* Jack Townsend, *Taxpayers Should Be Prosecuted with Enablers of Abusive Tax Shelters*, FED. TAX PROC. BLOG (Mar. 8, 2024, 12:51 PM), *available*

*at,* https://federaltaxprocedure.blogspot.com/2024/03/taxpayers-should-be-prosecuted-along.html (last visited June 2, 2025). Indeed, this case has already garnered national press. *See, e.g.*, Laura Saunders, *An IRS Crackdown on Abusive Trusts Snags a Dentist—and More*, WALL ST. J. (Sept. 27, 2024, 5:30 AM), *available at* https://www.wsj.com/personal-finance/taxes/abusive-trust-irs-dentist-6a1322a9?reflink=desktopwebshare_permalink.

**IV. The Need to Avoid Unwarranted Disparities**

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences. Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor that the Court must consider pursuant to 18 U.S.C. § 3553(a)(6).

Concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Guidelines. S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260. Among its principal architects was Justice Stephen Breyer, an original member of the Sentencing Commission. He explained that the Guidelines addressed the issue by requiring a "short but definite period of confinement" for all but "the least serious cases of these white-collar offenses (level '6' or less)[.]" Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 22 (1988). Not only did this reflect the severity of the offenses, but it also resolved "significant disparities" observed in data gathered by the Commission on how white-collar crimes were treated at sentencing relative to equally serious nonwhite-collar offenses in the pre-Guideline era. *Id.* at 20.

Put another way, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). "To reduce sentencing disparities, the Guidelines

sought to ensure more tax evaders were sentenced to prison, specifically focusing on those who evaded more than $100,000 in federal taxes." *United States v. Ture*, 450 F.3d 352, 358–59 (8th Cir. 2006). Defendant's crimes far exceed this harm.[6]

Accordingly, Defendant should also receive a Guidelines sentence to avoid disparity among other defendants sentenced for similar conduct. Courts routinely impose Guidelines range sentences for defendants convicted of similar conduct. *See* U.S. Sentencing Commission, Judiciary Sentencing Information (providing that in fiscal years 2020 to 2024, 93% offenders with a primary Guideline of § 2T1.1, a Total Offense Level of 20, and Criminal History Category of I were sentenced to a term of imprisonment and that the median length of such term was 33 months).[7]

Moreover, courts in this District, including this Court, have sentenced similarly situated defendants convicted of tax evasion with significant terms of imprisonment. *See, e.g.*, *United States v. Solomon Garcia*, No. 1:23-CR-443-NYW (D. Colo.) (sentencing defendant to 12 months and 1 day, a sentence within the Guidelines range, on plea of guilty to one count of tax evasion with $267,028 tax loss); *United States v. Steven Darbee*, Case No. 1:23-CR-99-NYW (D. Colo.) (same with $246,199 tax loss); *United States v. Lawrence Birk*, No. 1:18-CR-135-WJM (sentencing defendant to 60 months' imprisonment for tax evasion after jury trial with $1.8 million tax loss); *United States v. Daryl Yurek*, Case No. 1:15-CR-394-1-WJM (D. Colo.) (sentencing defendant to 50 months' imprisonment on tax evasion convictions after jury trial with $1.6 million tax loss); *United States v. Scott Roughen*, Case No. 1:18-CR-135-WJM (D. Colo.) (sentencing defendant to 24 months' imprisonment on a plea of guilty to one count of tax evasion with $1.4 million tax loss).

---

[6] U.S.S.G. § 5B1.1, n. 2 ("Where the applicable guideline range is in Zone C or D of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is eight months or more), the guidelines do not authorize a sentence of probation.")

[7] https://jsin.ussc.gov/analytics/saw.dll?Dashboard

**RESTITUTION**

Restitution is not mandatory in tax cases, but it may be ordered as a condition of supervision. 18 U.S.C. §§ 3556, 3563(b)(2), and 3583(d). Here, the Court should order $2,013,395 in restitution to the IRS and Colorado DOR. This figure reflects the sum of unpaid taxes that Defendant owes state and federal tax authorities (i.e., $1,611,587), as well as interest on the federal loss calculated through the date of sentencing (i.e., $401,808). (*See* Ex. 16 (federal interest table).)

**FINE**

Consistent with Probation's sentencing recommendation, the Court should order a $150,000 fine, at the high-end of the Guidelines range. (PSR, Ex. A.) Section 5E1.2 provides that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." In determining the amount of fine, the Court should consider several factors, including the need for the combined sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence. U.S.S.G. § 5E1.2(d)(1). The Court shall also consider any evidence regarding Defendant's ability to pay and any restitution that the defendant is obligated to make. *Id.* "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.*

Here, a $150,000 fine is necessary to reflect the seriousness of the offenses and to afford adequate deterrence. Though the Government also requests that Defendant be ordered to pay restitution to the IRS and Colorado DOR, a fine is nevertheless warranted given the longstanding and flagrant nature of Defendant's tax crimes. Notably, a $150,000 fine would amount to less than 10% of the harm Defendant caused to the United States and the state of Colorado in the form of unpaid income taxes, and the Government believes this amount is sufficiently punitive.

## CONCLUSION

The orderly financial functioning of this country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status. That system of voluntary compliance would crumble if business owners who engage in multi-year tax fraud schemes, through their corporate entities and otherwise, believed they could cheat with impunity or that the most severe sanctions that they would face when caught were merely the payment of financial penalties and a term of probation or some similar slap on the wrist.

Defendant's conduct—using an elaborate, multi-tiered trust structure; submitting false documents to the IRS, Colorado DOR, and various lenders; ignoring pointed warnings from tax professionals; and concealing over $5 million from the IRS—is egregious. On the facts of this case, involving a defendant who engaged in a multi-year tax fraud scheme borne not of necessity but greed, a sentence at the high-end of the Guidelines is entirely appropriate, eminently just, and no greater than necessary to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

For the foregoing reasons, the Government respectfully requests a sentence of 41 months' imprisonment, three years of supervised release, a fine of $150,000, and restitution of $2,013,395.[8]

Submitted this 6th day of June, 2025.

KAREN E. KELLY
Acting Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

/s/ *Amanda R. Scott*
AMANDA R. SCOTT
Trial Attorney
Wisconsin Bar No. 115668
U.S. Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002

[8] In *United States v. Stiner,* 952 F.2d 1401, at *4 (10th Cir. 1992) (unpublished), the Tenth Circuit held that imposition of costs of prosecution in a § 7201 case is mandatory. The Government will advise Defendant and Probation if it will seek such costs prior to the sentencing hearing.

Telephone: (202) 514-5384
E-mail: Amanda.R.Scott@usdoj.gov

/s/ *Lauren K. Pope*
LAUREN K. POPE
Trial Attorney
Illinois Bar No. 6333202
U.S. Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
Telephone: (202) 746-9068
E-mail: Lauren.K.Pope@usdoj.gov

ANDREW J. KAMEROS
Assistant Chief
District of Columbia Bar No. 410220
U.S. Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
Telephone: (202) 616-8684
E-mail: Andrew.J.Kameros@usdoj.gov

Attorneys for Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of June, 2025, I electronically filed the foregoing **GOVERNMENT'S SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

/s/ *Amanda R. Scott*
AMANDA R. SCOTT
Trial Attorney
U.S. Department of Justice, Tax Division